1
2
3
4                         UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    49HOPKINS, LLC,                          Case No.  19-cv-00811-SI

8                    Plaintiff,
                                              **ORDER GRANTING IN PART AND**
9         v.                                  **DENYING IN PART DEFENDANTS'**
                                              **MOTION TO DISMISS SECOND**
10   CITY AND COUNTY OF SAN                    **AMENDED COMPLAINT**
     FRANCISCO, et al.,
11                                            Re: Dkt. No. 54
                    Defendants.
12

13

14        Now before the Court is a motion to dismiss filed by defendants City and County of San

15   Francisco ("the City"), Planning Commission of the City and County of San Francisco ("Planning

16   Commission"), San Francisco Planning Department ("Planning Department"), San Francisco

17   Department of Building Inspection ("DBI"), and the San Francisco Board of Supervisors ("BOS").

18   Pursuant to Civil Local Rule 7-1(b) and General Order No. 72-5, the Court finds this matter

19   appropriate for resolution without oral argument and VACATES the hearing set for September 4,

20   2020.  The Court CONTINUES the case management conference to October 16, 2020, at 3:00 p.m.

21   For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART the motion

22   to dismiss.

23

24                              **BACKGROUND**

25        This lawsuit arises out of the demolition of a home in the Twin Peaks neighborhood of San

26   Francisco.  Plaintiff is a California limited liability company and is the owner of real property

27   situated at 49 Hopkins Avenue, San Francisco, California.  Dkt. No. 51 ("SAC") ¶ 3.  The subject

28   property was originally constructed in 1935 as a one-bedroom, 927 square foot single-family home

*United States District Court*
*Northern District of California*

by well-known architect Richard Neutra. *Id.* ¶ 21. The home had since been altered, primarily between 1959 and 2004, to include a second story, garage, and an enclosed swimming pool. *Id.* Post-alterations, the property included a 240 square foot garage; a 1,312 square foot two-story, one-bedroom home; and a 1,580 square foot indoor pool house, for a total of 3,132 square feet. *Id.* ¶ 22.

In 2014, the then-property owner engaged an architect to redesign the property into a three-story, four-bedroom/four bath, 3,675 square foot single-family home with a 240 square foot garage. *Id.* ¶ 23. The architect submitted the plans to the Planning Department, the then-owner engaged an architectural historian as required to conduct a historic evaluation of the property,[1] and on July 25, 2014, the then-owner began the permit approval process by submitting the architectural plans (commonly referred to as a "site plan") to DBI. *Id.* ¶¶ 23-25. The site plan and subsequently submitted addendum (including structural engineering plans) were part of the plans that were approved under the assigned permit number ("2014 Permit"). *Id.* ¶ 25. On or about August 10, 2015, the Planning Department approved the site plan, which authorized:

> REMOVAL [OF] EXISTING SUNROOM, INTERIOR REMODEL & VERTICAL ADDITION. WORK TO INCL: VERTICAL ADDITION ABOVE THE 2ND FLOOR, INTERIOR REMODEL OF 1ST & 2ND FLOOR. FRONT YARD TO REMOVE EXISTING WALL ENCLOSURE & PROPOSE LANDSCAPE.

*Id.* ¶ 26. The 2014 Permit required maintaining "(1) portions of the east side CMU [concrete masonry unit] wall; (2) portions of the existing second story kitchen floor; (3) portions of the existing framing above the garage; (4) portions of the westside wall at the bottom of [the] stairs leading to the front entrance[;] and (5) the underlying structure supporting the east side windows." *Id.* ¶ 31.

On or about December 3, 2015, after the Planning Department and DBI's approval of the site plan, the then-property owner submitted a structural engineering plan addendum to DBI as part of DBI's process for approving the 2014 Permit. *Id.* ¶ 28. In May 2016, DBI approved and stamped the 2014 Permit for the proposed three-story, four-bedroom/four bath single-family home,

---

[1] The architectural historian determined the property "was not a historic resource given the multiple alterations and renovations that had taken place since Neutra's original 1935 construction of the Property." SAC ¶ 24.

United States District Court
Northern District of California

containing 3,675 square foot of living space and a 240 square foot garage.  *Id.*

Plaintiff purchased the property and 2014 Permit in January 2017.  *Id.* ¶ 29.  Work on the property began in August 2017 after plaintiff secured construction financing.  *Id.*  The SAC alleges, "During the approved demolition work at the Property, the General Contractor exposed various portions of the existing building structure that were previously hidden behind walls.  Upon exposure, the General Contractor discovered that several of the structural elements expected to remain in place by the 2014 Permit were, in fact, structurally compromised and he determined that those elements posed immediate life-safety dangers to his construction crew."  *Id.* ¶ 30.  "The General Contractor, based on his professional experience and knowledge, understood and determined that the compromised structural elements uncovered during demolition would need to be removed one way or the other because they could not structurally support the three-story home in the 2014 Permit AND because they posed immediate life-safety hazards for workers."  *Id.* ¶ 37 (emphasis omitted). Rather than stop work, plaintiff's general contractor "immediately remove[d] the compromised structure for life-safety reasons even though the 2014 Permit called for maintaining those structural elements as part of the new home."  *Id.*  Plaintiff's general contractor "understood that as a matter of long-standing practice at DBI, the removal of the compromised structure would necessarily require submission of revised structural engineering plans to DBI as part of an alteration permit prior to commencement of any construction."  *Id.*

On October 4, 2017, in response to a neighbor's complaint, DBI issued a Notice of Violation ("NOV") "for the portion of demolition work that had occurred beyond the scope of the 2014 Permit."  *Id.* ¶ 38 (emphasis omitted).  The notice of violation states that "it appears the scope of demolition has been exceeded.  The entire house has been demolished, except for the garage area." Dkt. No. 37 at 6 (RJN Ex. B – Notice of Violation);[2] *see also* Dkt. No. 55 at 4 (Defs' RJN Ex. A – Notice of Violation).[3]  The NOV cited San Francisco Building Code ("SFBC") section 106A.4.7,

_____

[2] For ease of reference, all citations to page numbers refer to the ECF branded number in the upper right corner of documents.

[3] The Court previously granted judicial notice of this document.  Dkt. No. 48 at 1 n.1.  The parties have now filed numerous additional requests for judicial notice.  Dkt. Nos. 55 ("Defs' RJN"), 59 ("Pl.'s RJN"), 64.  Judicial notice of local laws, resolutions, and records of administrative

United States District Court
Northern District of California

1    "ADDITIONAL WORK-PERMIT REQUIRED."  SAC ¶ 38.  The NOV listed three Corrective

2    Actions: "STOP ALL WORK SFBC section 104A.2.4, file building permit application within 15

3    days with plans, and obtain permit within 30 days and complete all work within 60 days including

4    final inspection and sign-off."  *Id.*  The NOV further stated, "STOP ALL WORK.  Submit plans

5    that show full scope of demolition. Plans shall be routed to Planning Dept. For [sic] review and

6    approval.  No work may take place until a new building permit has been obtained."  Dkt. No. 55 at

7    4 (Defs' RJN Ex. A – Notice of Violation).

8         A meeting among plaintiff's representatives and senior DBI inspectors followed.  SAC ¶ 39.

9    Plaintiff alleges that on October 20, 2017, BOS member Aaron Peskin wrote to several individuals,

10   including the head of the Planning Department and the Planning Department's Zoning

11   Administrator regarding the subject property and said, "This is insane.  We need to figure out how

12   to stop this.  I am going to start holding hearings as this is happening way too often and is entirely

13   unacceptable."  *Id.* ¶ 40.  That same day, the Planning Department's Zoning Administrator stated

14   via email that the subject property "wasn't a historic resource because it no longer retained integrity

15   given past alterations.  Also. . . the building last sold for $1.7 million . . . ***so it may appraise out of***

16   ***the CU requirement.***"  *Id.* (ellipses and emphases in SAC).  The SAC states, "The 'CU requirement'

17   refers to Planning Code section 317, under which 'tantamount to demolition' violations under the

18   Planning Code are processed.  If the property at issue is 'demonstrably not affordable . . . housing'

19   then the property need not go through the Planning Commission to have a 'tantamount to

20   demolition' violation approved; the Planning Department may so do without the issuance of a

21   conditional use authorization."  *Id.* ¶ 40 n.1.

22        On November 7, 2017, the Planning Department issued a Notice of Enforcement ("NOE").

23   _____

24   proceedings is appropriate here.  *See, e.g., Colony Cove Properties, LLC v. City Of Carson*, 640
     F.3d 948, 954-56 n.3-4 (9th Cir. 2011) (taking judicial notice of undisputed contents of local

25   ordinances and resolutions).  In all other respects, the parties' requests for judicial notice are
     DENIED without prejudice.  The parties largely seek judicial notice either: of the contents of

26   documents that are in dispute, making them inappropriate for judicial notice under Federal Rule of
     Evidence 201; or of documents otherwise not properly subject to judicial notice, such as the SAC

27   and prior Court Order in this case and a declaration from plaintiff's managing member Ross
     Johnston.  *See, e.g.,* Defs' RJN, Ex. C-F (seeking judicial notice of documents regarding whether

28   plaintiff requested cancellation of the 2014 Permit); Pl.'s RJN, Ex. A (SAC), O (Prior Order), Q
     (Johnston Decl.).

*Id.* ¶ 42.  The NOE "indicated that 'the subject property is in violation for exceeding scope of work' under the 2014 Permit" and that the "Planning Department requires that you immediately proceed to abate the violation by submitting a ***revised*** Building Permit Application."  *Id.*

Plaintiff alleges that on or about November 17, 2017, "DBI and the Planning Department erroneously instructed the Architect that the 2014 Permit would need to be cancelled in order to submit revised plans, even though work had already commenced under the 2014 Permit."  *Id.* ¶ 43. Plaintiff alleges that defendants "were required to issue an *additional* alteration permit for any change in work or additional work, as stated in the NOV, and per SFBC section 106A.4.7[,]" and that defendants lacked the discretion to cancel the 2014 Permit.  *Id.*  Plaintiff contends that if "DBI [had] intended to prevent further work from being performed under the 2014 Permit, DBI was required to *revoke* the 2014 Permit" rather than cancel it.  *Id.* ¶ 43 n.2.

On December 7, 2017, plaintiff's architect submitted revised plans and a conditional use authorization ("CUA") application to the Planning Department, seeking "approval for the portion of demolition that had exceeded the scope of the 2014 Permit and approval for a three-story single-family house substantially similar to the one previously approved[.]"  *Id.* ¶ 46.  That same day, the architect also provided the Planning Department with plaintiff's property purchase agreement for the purpose of appraising out of the CUA requirement.  *Id.*  Plaintiff alleges that the subject property's valuation at the time would have permitted the property to administratively appraise out of the CUA requirement.  *Id.*  However, the Planning Department verbally informed plaintiff's architect that the property would not meet the threshold valuation, "despite the fact that the $1.7 million purchase price exceeded the then-existing valuation threshold of $1.63 million.  The $1.63 million threshold valuation was then changed by the Planning Department's Assistant Zoning Administrator to $1,900,000 eight days later (effective December 15, 2017), so that the Property no longer qualified for appraising out of the CUA requirement."  *Id.*

Plaintiff alleges that on December 13, 2017, DBI erroneously cancelled the 2014 Permit in violation of its own procedures, and that plaintiff therefore "had no opportunity to appeal the cancellation as would have been the case if the 2014 Permit had been 'revoked.'"  *Id.* ¶ 47. Subsequently, defendants informed the architect that plaintiff would need to proceed with a CUA

to legalize the demolition that had exceeded the scope of the 2014 Permit. *Id.* ¶ 48. Plaintiff states, "Effectively, this meant that the Defendants were now treating the code violation as an 'unlawful demolition' under SFBC section 103A.1 instead of a 'work beyond permit scope' violation under 106A.4.7 for which Plaintiff had been cited." *Id.*

In January 2018, plaintiff alleges that senior DBI inspectors, "in an apparent response to the brewing political firestorm and a variety of negative press-releases about unauthorized demolition work," made a presentation to the Building Inspection Commission "on various City construction projects where the scope of a permit had been exceeded[,]" including the subject property. *Id.* ¶ 49. Plaintiff alleges that throughout January and February 2018 the property "was the hyper-focus" of various negative and false press accounts. *Id.* ¶ 51. The SAC states that "[b]etween March and October 2018, the Planning Department staff began demanding Plaintiff modify its plan for the Property," including removal of the third floor of the project, which had previously been authorized under the 2014 Permit. *Id.* ¶ 52. "The Planning Department also indicated to Plaintiff that its recommendation to the Planning Commission would be to approve the CUA, with the modification that the third story be removed." *Id.*

Plaintiff's CUA for the property was set to be heard before the Planning Commission on December 13, 2018. *Id.* ¶ 58. The Notice for the hearing stated that the item was a "Request for Conditional Use Authorization, pursuant to Planning Code Sections 303 and 317 **to legalize the tantamount to demolition** of a single-family home . . . **Preliminary Recommendation: Approve with Conditions and Modifications.**" *Id.* (emphasis in SAC). On December 10, 2018, BOS member Aaron Peskin "announced proposed City legislation that would punish property owners who illegally demolish homes." *Id.* ¶ 59. At the December 13, 2018 Planning Commission meeting, "[a]s expected, the Planning Department recommended that the project be modified to two stories instead of the three stories previously approved in the 2014 Permit." *Id.* ¶ 61. After plaintiff presented its proposal and after close of public comments, the Planning Commission, "led by Commissioner Richards," voted 5-0 to approve a project that required plaintiff to (1) rebuild a replica of the 1935 original 927 square foot, one-bedroom structure, and (2) install an "interpretative plaque" stating the property was a replica of a Neutra design that had been "accidently demolished"

United States District Court
Northern District of California

and rebuilt per the decision of the Planning Commission ("CUA Decision I").  *Id.* ¶¶ 62, 65.  Plaintiff alleges that because public comment had closed and because there had been no indication on the Notice of Hearing that the Planning Commission was contemplating requiring plaintiff to build a wholly different project from what was authorized under the 2014 Permit, plaintiff had no opportunity to object and had no automatic appellate rights to challenge the decision.  *Id.* ¶ 65.  Following CUA Decision I, the Planning Department determined that it would "prepare a notice once the [CUA Decision] becomes final and give the owner 30 days to respond."  *Id.* ¶ 66.

The SAC alleges that CUA Decision I received "extraordinary levels of media coverage locally, regionally, nationally, and internationally," and that "within days" plaintiff's reputation was damaged by negative and unfair coverage "painting Plaintiff as a real estate speculator who illegally demolished the 1935 San Francisco home of a world-renowned architect."  *Id.* ¶ 67.  For instance, on December 15, 2018, the San Francisco *Chronicle* reported, "Planning Commissioner Dennis Richards said he hopes the commission's action in the 49 Hopkins case will send a message to speculators accustomed to ignoring city planning and building laws with few or no repercussions. 'We are tired of seeing this happening in the city and are drawing a line in the sand,' said Richards." *Id.* ¶ 92.  In a December 17, 2018 Washington *Post* article,[4] Planning Commissioner Richards (whom plaintiff describes as "the ringleader of CUA Decision I"), was quoted as saying, in reaction to plaintiff's potential appeal to the Board of Supervisors, "They would probably vote 11-0 and tell him to go to hell."  *Id.* ¶ 68.  On January 16, 2019, according to the SAC,

> Planning Commissioner Richards was quoted in the San Francisco *Chronicle* as stating that the Planning Commission never claimed that the building on the Property was historic. Rather, Richards stated, the CUA Decision I was aimed at speculators who buy modest homes only to knock them down illegally and replace them with much larger, more valuable houses. In response to Plaintiff challenging the CUA Decision I, Richards replied flippantly:
>
> "Good luck to him — he is within his right to appeal, but I don't know what he thinks he is going to get out of it. He is not going to get permission to build a 4,000-square-foot replacement structure. I would bet my house on it."

*Id.* ¶ 69.

---

[4] The SAC states the article ran on December 17, 2017, but the Court presumes this is an error and the correct year is 2018, given the chronology of events here.  *See* SAC ¶ 68.

In response, on February 14, 2019, plaintiff filed this action, along with "a related state court action." *Id.* ¶¶ 17, 70. Through its attorneys, plaintiff "called the decision 'invalid, bizarre, and illegal' in the press. Plaintiff was quoted in the San Francisco *Chronicle* on February 15, 2019 as saying: 'This case is just another example of abusive, retroactive government overreach by unaccountable, unelected bureaucrats drunk with power.'" *Id.* ¶ 91.

After filing the instant lawsuit, plaintiff met with the City Attorney's Office and Planning Department staff to confer about CUA Decision I and develop an alternative project to present to the Planning Commission. *Id.* ¶ 71. Over the course of nearly seven months, they negotiated a project proposal for a three-story, two-unit building, totaling 4,180 gross square feet allocated into (1) a 2,625 square foot four-bedroom, three-bath, primary unit on the top two floors, (2) a 1,200 square foot, two-bedroom, two-bath accessory dwelling unit on the lower level, and (3) a 355 square foot garage.[5] *Id.*

On August 29, 2019, after denying plaintiff's request for a continuance, the Planning Commission considered the negotiated project proposal. *Id.* ¶¶ 73-74. Planning Department staff recommended the Commission approve the proposal. *Id.* ¶ 74. The Planning Commission did not fully approve the negotiated proposed project, stating that it was "incompatible with the size and massing of the neighborhood[.]" *Id.* ¶ 76. In its decision ("CUA Decision II"), the Planning Commission limited the project to 3,280 square feet, with at least 1,000 square feet allocated to a two-bedroom accessory dwelling unit, and removed the proposed roof deck from the primary unit. *Id.* ¶¶ 71, 77-79. Plaintiff alleges that the imposition of these conditions on the negotiated project proposal and the failure to approve the demolition over the scope of the 2014 Permit effectively "resulted in *no* approval of any project." *Id.* ¶ 76. According to plaintiff, the loss of square footage that the Planning Commission imposed (635 square feet from the 2014 Permit plans and 900 square feet from the negotiated project proposal) makes the project economically infeasible. *Id.* ¶ 77. Plaintiff further alleges that "[t]he actual reason for the Planning Commission's CUA Decision II was to retaliate against Plaintiff for suing them for the imposition of the CUA Decision I." *Id.* ¶ 79.

---

[5] Plaintiff refers to this project proposal as the "Negotiated Compromise," SAC ¶ 71, and the "Negotiated Decision." *See* Opp'n at 23.

United States District Court
Northern District of California

In response to CUA Decision II, on October 11, 2019, plaintiff filed an amended complaint, bringing seven claims for relief. *See* Dkt. No. 23.  On February 28, 2020, the Court granted in part and denied in part defendants' motion to dismiss the amended complaint.  Dkt. No. 48.  The Court concluded "that plaintiff 49 Hopkins, LLC does not have a vested right in the 2014 permit at issue[.]" *Id.* at 1.  The Court therefore dismissed, with leave to amend, plaintiff's first cause of action for Violation of Fundamental Vested Rights under 42 U.S.C. § 1983, second cause of action for Violation of Due Process under 42 U.S.C. § 1983, and third cause of action for Inverse Condemnation.  The Court deferred ruling on plaintiff's remaining claims for relief until after the filing of plaintiff's second amended complaint.

On May 8, 2020, plaintiff filed a second amended and supplemental complaint.  Dkt. No. 51.  The second amended complaint includes the following claims for relief: Violation of the Constitutional Right to Petition and of Access to Courts, under 42 U.S.C. § 1983 (First Claim), Violation of Due Process under 42 U.S.C. § 1983 (Second Claim), Inverse Condemnation (Third Claim), Violation of Equal Protection under 42 U.S.C. § 1983 (Fourth Claim), Violation of Excessive Fines Clause under 42 U.S.C. § 1983 (Fifth Claim), Writ of Mandate per California Code of Civil Procedure § 1094.5 or 1085 (Sixth Claim), and Writ of Mandate per California Code of Civil Procedure § 1094.5 or 1085, California Government Code § 65589.5 (Seventh Claim). Defendants now move to dismiss all seven claims of the second amended complaint.[6]

## LEGAL STANDARDS

### I.      Rule 12(b)(1) Motion

Fed. R. Civ. P. 12(b)(1) allows a party to challenge a federal court's jurisdiction over the subject matter of the complaint.  As the party invoking the jurisdiction of the federal court, the plaintiff bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377

---

[6] The SAC also alleges an Eighth Claim (previously brought as the First Claim in the amended complaint), for violation of fundamental vested rights, which plaintiff realleges "expressly to preserve it for Plaintiff's right to appeal."  SAC ¶¶ 143-144 & n.5.  The Court will not address this claim further.

1    (1994) (internal citations omitted).  A complaint will be dismissed if, looking at the complaint as a

2    whole, it appears to lack federal jurisdiction either "facially" or "factually."  *Thornhill Publ'g Co.,*

3    *Inc. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979); *Safe Air for Everyone v.*

4    *Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("A Rule 12(b)(1) jurisdictional attack may be facial or

5    factual.").

6         When the complaint is challenged for lack of subject matter jurisdiction on its face, all

7    material allegations in the complaint will be taken as true and construed in the light most favorable

8    to the plaintiff.  *NL Indus. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

9         "In resolving a factual attack on jurisdiction, the district court may review evidence beyond

10   the complaint without converting the motion to dismiss into a motion for summary judgment."  *Safe*

11   *Air for Everyone*, 373 F.3d at 1039 (citing *Savage v. Glendale Union High Sch.*, 343 F.3d 1036,

12   1039 n.2 (9th Cir. 2003)).  If the moving party converts its motion to dismiss into a factual motion

13   by submitting affidavits, the opposing party must then also present affidavits or other evidence to

14   meet its burden for satisfying subject matter jurisdiction.  *Id.*

15

16   **II.     Rule 12(b)(6) Motion**

17        A complaint must contain "a short and plain statement of the claim showing that the pleader

18   is entitled to relief," and a complaint that fails to do so is subject to dismissal pursuant to Rule

19   12(b)(6).  Fed. R. Civ. P. 8(a)(2).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must

20   allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

21   550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts

22   that add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v.*

23   *Iqbal*, 556 U.S. 662, 678 (2009).  While courts do not require "heightened fact pleading of

24   specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative

25   level."  *Twombly*, 550 U.S. at 555, 570.  "A pleading that offers 'labels and conclusions' or 'a

26   formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678

27   (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]'

28   devoid of 'further factual enhancement.'"  *Id.*  (quoting *Twombly*, 550 U.S. at 557).  "While legal

United States District Court
Northern District of California

1    conclusions can provide the framework of a complaint, they must be supported by factual
2    allegations." *Id.* at 679.

3        In reviewing a Rule 12(b)(6) motion, courts must accept as true all facts alleged in the
4    complaint and draw all reasonable inferences in favor of the non-moving party. *See Usher v. City*
5    *of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, courts are not required to accept as
6    true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable
7    inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

8        If a court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth
9    Circuit has repeatedly held that "a district court should grant leave to amend even if no request to
10   amend the pleading was made, unless it determines that the pleading could not possibly be cured by
11   the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations and
12   internal quotation marks omitted).

13

14                                        **DISCUSSION**

15   **I.    Plaintiff's Claims Under 42 U.S.C. § 1983**

16       In order to state a claim under § 1983, a plaintiff must show both (1) the deprivation of a
17   right secured by the Constitution and laws of the United States, and (2) that the deprivation was
18   committed by a person acting under color of state law. 42 U.S.C. § 1983; *Broam v. Bogan*, 320
19   F.3d 1023, 1028 (9th Cir. 2003). Plaintiff's first, second, third, fourth, and fifth causes of action
20   implicate § 1983.

21

22       **A.    Constitutional Right to Petition and of Access to Courts (First Claim)**

23       In the SAC, plaintiff adds a new claim for relief under the First Amendment of the U.S.
24   Constitution. *See* SAC ¶¶ 94-97. Plaintiff alleges that it "has made active and continuous attempts
25   to protect its Property interest and prosecute Defendants' illegal CUA Decision I and CUA Decision
26   II by filing this action, filing the related state court action, and making public statements about the
27   improprieties of the Planning Commission and Commissioner Richards." *Id.* ¶ 96. Plaintiff alleges
28   that after it "made such public statements and sued Defendants for their imposition of the CUA

United States District Court
Northern District of California

United States District Court
Northern District of California

Decision I, Defendants deliberately and intentionally retaliated against Plaintiff via Defendants['] imposition of CUA Decision II for Plaintiff exercising Plaintiff's constitutional right to petition the government for redress of its grievances."  *Id.*  In other words, plaintiff's First Amendment theory is that "Defendants' imposition of CUA Decision II was retaliatory in nature in that it was meant to stifle Plaintiff's constitutional rights . . . ."  *Id.* ¶ 97.

In their motion to dismiss, defendants misconstrue the nature of this claim, arguing that "Plaintiff appears to assert that its First Amendment rights were violated when Plaintiff was forced to submit to the Conditional Use process" and stating that "Plaintiff's application for a Conditional Use authorization is not equivalent to a petition to the Government for redress of grievances under the First Amendment."  Dkt. No. 54 ("Mot.") at 20.  In their reply brief, defendants argue that "Plaintiff offers wholly unsupported conclusions, without factual allegations supporting a cognizable claim that the City 'retaliated,' injuring Plaintiff."  Dkt. No. 63 ("Reply") at 9.

The Court agrees with defendants that the SAC offers only conclusory allegations on an element of plaintiff's First Amendment retaliation claim, namely, the causal relationship between the protected activity and defendants' conduct.  As the Ninth Circuit has explained,

> To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would "chill a person of ordinary firmness" from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech.  *O'Brien [v. Welty]*, 818 F.3d [920,] 933-34 [(9th Cir. 2016)] (citing *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006); *Mendocino Envt'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)); *see also Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  Further, to prevail on such a claim, a plaintiff need only show that the defendant "intended to interfere" with the plaintiff's First Amendment rights and that it suffered some injury as a result; the plaintiff is not required to demonstrate that its speech was actually suppressed or inhibited. *Mendocino Envt'l Ctr.*, 192 F.3d at 1300.

*Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).  *But see Sharp v. County of Orange*, 871 F.3d 901, 919 (9th Cir. 2017) (applying but-for causation standard in summary judgment context); *see also Skoog v. County of Clackamas*, 469 F.3d 1221, 1231-32 (9th Cir. 2006).  "At the pleading stage, a plaintiff adequately asserts First Amendment retaliation if the complaint alleges plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct." *Arizona Students' Ass'n*, 824 F.3d at 870 (citing *O'Brien*, 818 F.3d at 933-

34, 935).

Thus, in *Arizona Students' Association*, the Ninth Circuit reversed the dismissal of a First Amendment retaliation claim brought by a non-profit student corporation against the Arizona Board of Regents, after the Board suspended collection of the student corporation's funding weeks after an election in which the corporation advocated for a ballot initiative that several members of the Board had opposed. In finding that the complaint adequately alleged the defendant acted with a retaliatory motive, the Ninth Circuit cited "several plausible factual allegations": that several Regents publicly acknowledged the decision to suspend fee collection was "political in nature and resulted from [the plaintiff's] advocacy in support of" the ballot initiative; that several members of the Board criticized the plaintiff for supporting the initiative; and the temporal proximity between the plaintiff's exercise of its free speech rights and Board's allegedly retaliatory conduct. *Id.* at 870-71.

By contrast, in a case out of this District, Judge Seeborg found that the plaintiff AIDS Healthcare Foundation, Inc. failed to adequately allege that San Francisco city legislators had retaliated against it "for taking a public and unpopular position in opposition to a certain HIV/AIDS treatment [PrEP]" when the City passed new zoning rules, with the effect of delaying and imposing additional costs on the plaintiff's pending building permit application. *AIDS Healthcare Found., Inc. v. City & County of San Francisco*, No. 14-cv-3499-RS, Dkt. No. 53 at 1, 11-13 (N.D. Cal. Jan. 21, 2015). Judge Seeborg summarized the relevant allegations as follows:

> Supervisor Wiener publicly advocates the use of PrEP; AHF is a visible critic of the same medication. AHF's views in this regard are apparently controversial within the HIV/AIDS healthcare community and conflict with the position taken by SFAF, a competing healthcare organization supported by Supervisor Wiener. Without more, these allegations simply cannot support an inference that Supervisor Wiener spearheaded the passage of the Interim Controls to punish AHF for its views.

*Id.* at 12. Finding the complaint failed to "achieve the requisite standard of plausibility" under *Iqbal*, Judge Seeborg dismissed the claim with leave to amend. *Id.* at 12-13.

Here, the allegations of the SAC are more like those of *AIDS Healthcare Foundation* than of *Arizona Students' Association*. The SAC lacks detail to support the allegations that CUA Decision II was a retaliatory response to plaintiff filing this lawsuit or to plaintiff making negative

remarks in the press.  Taking the allegations of the SAC as true, the SAC shows that plaintiff's property was already the subject of controversy before plaintiff filed suit or spoke to the press. Plaintiff filed suit in this Court on February 14, 2019.  Dkt. No. 1; SAC ¶ 70.  In the wake of the December 2018 CUA Decision I, plaintiff made comments to the press that the decision was "invalid, bizarre, and illegal," and plaintiff was quoted in the San Francisco *Chronicle* on February 15, 2019, saying, "This case is just another example of abusive, retroactive government overreach by unaccountable, unelected bureaucrats drunk with power." SAC ¶ 90.  Following CUA Decision I, nearly seven months of meetings and negotiations ensued among plaintiff, the City Attorney's Office, and Planning Department staff.  *Id.* ¶ 70.  This resulted in a project proposal for a 31 foot tall, three-story, two-unit building, allocated into (1) a 2,625 square foot four-bedroom, three-bath, primary unit with a roof deck on the top two floors, (2) a 1,200 square foot, two-bedroom, two-bath accessory dwelling unit on the lower level, and (3) a 355 square foot garage.  *Id.*  On August 29, 2019, in CUA Decision II, the Planning Commission "approved" the project, with limitations as follows: the project would not exceed 3,280 square feet, with at least 1,000 square feet allocated to a two-bedroom accessory dwelling unit, and without the proposed roof deck on the primary unit. *Id.* ¶¶ 71, 77-79.

What the SAC lacks are any allegations rising above the speculative level to tie CUA Decision II to plaintiff's filing of the lawsuit or speaking out in the press.  From the timeline of the SAC, it appears that the City Attorney's Office and Planning Department staff began negotiations with plaintiff before or around the time that plaintiff filed this suit (i.e., roughly seven months, *see id.* ¶ 71), and that those negotiations continued well after plaintiff filed suit.  Plaintiff cites no statements from any defendant that CUA Decision II was a "political decision" or that it was meant as punishment for plaintiff's exercise of First Amendment rights.  While the SAC cites a quote from Planning Commissioner Richards that he would "bet [his] house on it" that plaintiff would never gain approval to build a 4,000 square foot structure, that statement was made in January 2019, nearly one month *before* plaintiff sued or was quoted in the San Francisco *Chronicle*.  *See id.* ¶ 69.

Because the SAC lacks allegations showing "a nexus between the defendant's actions and an intent to chill speech," *see Arizona Students' Ass'n*, 824 F.3d at 867, plaintiff's First Claim is

DISMISSED, with leave to amend.

### B.     Due Process (Second Claim)

In relevant part, the Fourteenth Amendment commands that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV § 1.  Plaintiff contends that defendants violated its procedural and substantive due process rights.  SAC ¶ 105.

To succeed on either a substantive or procedural due process claim, a plaintiff "must first demonstrate that he was deprived of a constitutionally protected property interest." *Gerhart v. Lake County, Mont.*, 637 F.3d 1013, 1019 (9th Cir. 2011) (citing *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008) (substantive due process); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998) (procedural due process)).  As stated by the Ninth Circuit,

> [I]n *Nunez*, we explicitly held that "[t]here is no general liberty interest in being free from capricious government action." *Nunez [v. City of Los Angeles]*, 147 F.3d. [867,] 873 (9th Cir. 1998)]; *see City of Cuyahoga Falls[, Ohio v. Buckeye Comm. Hope Fdn.]*, 538 U.S. [188,] 200, 123 S. Ct. 1389 [(2003)] (Scalia, J., concurring) ("Those who claim 'arbitrary' deprivations of non-fundamental liberty interests must look to the Equal Protection Clause.").

*Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 949 (9th Cir. 2004), *overruled on other grounds by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005).

The Court previously dismissed this claim with direction for plaintiff to amend "to specify exactly what property rights defendants impinged."  Dkt. No. 48 at 9.  The SAC is less than clear on the property right at stake but appears to continue to rest on a vested right to the 2014 Permit even after the Court rejected this argument.  *See* SAC ¶¶ 99, 100, 102, 104.[7]

---

[7] These paragraphs allege, in relevant part:

Defendants' cancellation of the 2014 Permit, requirement that Plaintiff submit a CUA application to appear before the Planning Commission, CUA Decision I, and CUA Decision II deprived Plaintiff of due process as required by law in that such cancellation, submission requirements, and CUA decisions were made without notice, and/or after public comment had closed, and/or without allowing Plaintiff an opportunity to object or appeal.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In its opposition to the motion to dismiss, plaintiff articulates the following property interests: "(1) the right to be free of selective enforcement of the laws; (2) the right to use and enjoyment of its Property; (3) the right under the California Housing Accountability Act, Gov. Code section 65589.5 (the 'HAA') to approval of the Negotiated Decision; and (4) reputational injury combined with Defendants' deprivation of the aforesaid interests." Dkt. No. 58 ("Opp'n") at 23.

Plaintiff raises the first interest, the right to be free of selective enforcement of the laws, only with respect to its Equal Protection claim, which the Court addresses in § I.D, below. With regard to "the right to use and enjoyment of its Property," the Court agrees with defendants that plaintiff has not articulated a cognizable property interest under the facts alleged here. Plaintiff relies on

_____

SAC ¶ 99.

. . . DBI unlawfully deprived Plaintiff of its property interest by cancelling the 2014 Permit without notice and thus violated Plaintiff's substantive and procedural due process rights.

*Id.* ¶ 100.

. . . the Planning Commission unlawfully deprived Plaintiff of right to appeal DBI's cancellation of the 2014 Permit, rejected continuance requests at both CUA hearings that are customarily granted, deprived Plaintiff of right to be heard prior to imposing a wholly new project on Plaintiff during both CUA Decision I and CUA Decision II, provided no notice of its imposition of the CUA Decision I or CUA Decision II, and deprived Plaintiff [of] a meaningful opportunity to be heard on CUA Decision I or CUA Decision II. . . . The Planning Commission's failure to give Plaintiff notice of its intent to deprive Plaintiff of its property interests and failure to allow Plaintiff a meaningful opportunity to be heard regarding CUA Decision I and CUA Decision II violated Plaintiff's due process.

*Id.* ¶ 102.

The cancellation of the 2014 Permit, CUA Decision I, and CUA Decision II arbitrarily, capriciously, improperly, and unreasonably imposes a requirement that Plaintiff construct a building of 3,280 square feet – a wholly separate project than the 3,915 square foot building approved under the 2014 Permit and a wholly separate project from the Negotiated Compromise – without due process of law.

*Id.* ¶ 104.

For the foregoing reasons, the cancellation of the 2014 Permit, the CUA Decision I, and CUA Decision II violate Plaintiff's right to substantive and procedural due process of law.

*Id.* ¶ 105.

*Squaw Valley* for the proposition that there is a "constitutionally 'protected property interest' in a landowner's right to 'devote [his] land to any legitimate use.'" *Id.* at 24 (quoting *Squaw Valley Dev. Co.*, 375 F.3d at 949). Yet the *Squaw Valley* court didn't reach the question of whether a plaintiff developer had stated a substantive due process claim; instead, the court found that claim was foreclosed by the Takings Clause (a proposition that the Supreme Court since overruled in *Lingle*). The Ninth Circuit in *Squaw Valley* said only that "presumably" the developer's substantive due process claim rested on the assertion that the "alleged overzealous and selective regulation of Squaw Valley interferes with its use of its real property"—the court made no ruling that such a claim was validly stated. *See Squaw Valley Dev. Co.*, 375 F.3d at 949. Likewise, *Harris* (as relied on by the *Squaw Valley* court) is distinguishable, in that there the Ninth Circuit stated that the county's rezoning of the plaintiff's land to residential use "unquestionably" deprived the plaintiff of his right to use the property for commercial purposes. *See Harris v. County of Riverside*, 904 F.2d 497, 501 (9th Cir. 1990).

Here, even under the facts alleged in the SAC, plaintiff has not been deprived of its right to use and enjoyment of the property. Although plaintiff argues that CUA Decision II "in effect, resulted in *no* approval of any project[,]" *see* Opp'n at 18, the facts pleaded show otherwise. In CUA Decision II, plaintiff received approval to proceed with a project totaling 3,280 square feet, consisting of two units, with the accessory dwelling unit having two bedrooms and at least 1,000 square feet. SAC ¶¶ 77-79. Plaintiff's allegation that "[t]he loss of square footage makes the [project approved in CUA Decision II] economically infeasible" is simply not plausible.

Third, plaintiff asserts a property right in its alleged "right . . . to approval of the Negotiated Decision" under California Government Code section 65589.5. Opp'n at 23. The Court presumes that plaintiff relies on subsection (j), as contrasted with subsection (d), which applies to "very low, low-, or moderate-income households." *See* Cal. Gov't Code § 65589.5(d), (j). Subsection (j) provides, in relevant part:

> (j)(1) When a proposed housing development project complies with applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards, in effect at the time that the application was deemed complete, but the local agency proposes to disapprove the project or to impose a condition that the project be developed at a lower density, the local agency shall base

United States District Court
Northern District of California

its decision regarding the proposed housing development project upon written findings supported by a preponderance of the evidence on the record that both of the following conditions exist:

(A) The housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density. As used in this paragraph, a "specific, adverse impact" means a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete.

(B) There is no feasible method to satisfactorily mitigate or avoid the adverse impact identified pursuant to paragraph (1), other than the disapproval of the housing development project or the approval of the project upon the condition that it be developed at a lower density.

*Id.* § 65589.5(j).

Subsection (h) further provides:

"Disapprove the housing development project" includes any instance in which a local agency does either of the following:

(A) Votes on a proposed housing development project application and the application is disapproved, including any required land use approvals or entitlements necessary for the issuance of a building permit.

(B) Fails to comply with the time periods specified in subdivision (a) of Section 65950. An extension of time pursuant to Article 5 (commencing with Section 65950) shall be deemed to be an extension of time pursuant to this paragraph.

*Id.* § 65589.5(h).

Plaintiff relies on a ruling out of this District, *North Pacifica, LLC. v. City of Pacifica*, 234 F. Supp. 2d 1053, 1059-60 (N.D. Cal. 2002), *disapproved on other grounds by N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478 (9th Cir. 2008). There, the plaintiff asserted a substantive due process right to approval of its permit application under section 65589.5, after the city took nearly two years to approve the application. The district court found that the plaintiff had sufficiently asserted a constitutionally protected property interest in the enforcement of section 65589.5. *N. Pacifica, LLC*, 234 F. Supp. 2d at 1059-60. That case is distinguishable because the statute lists delays in the approval process as one of two circumstances constituting a "disapproval" that must trigger the local agency to make certain findings. *See* Cal. Gov't Code § 65589.5(h)(6). Moreover, defendants argue, and this Court agrees, that the statute does not on its face entitle a developer to approval of a proposed project as it is proposed. *See Gerhart*, 637 F.3d at 1019 ("To have a property interest in a

government benefit, 'a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of *entitlement* to it.'") (quoting *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577 (1972) (emphasis added by Ninth Circuit).  Rather, the statute states that if the local agency disapproves the project, or if it requires the project be developed at a lower density, then the agency must make certain findings.  *See* Cal. Gov't Code § 65589.5(j)(1).  The Court finds that the property interest in section 65589.5 that plaintiff articulates does not rise to the level of a constitutionally protected interest under the Due Process Clause.[8]

Finally, plaintiff argues that "a plaintiff is deprived of a due process liberty when government both injures one's reputation and extinguishes legal rights."  Opp'n at 25.  Even disregarding the threadbare nature of the allegations concerning harm to plaintiff's reputation in the SAC, where the Court has now found there are no "aforesaid property interest deprivations," *see id.*, plaintiff has failed to state a constitutionally protected property interest based on reputational harm.

Where there is no constitutionally protected property interest, there can be no Due Process violation.  The Court previously dismissed the Due Process claim with leave to amend to specify exactly what property rights defendants impinged.  Having found that the SAC still fails to identify a cognizable property right, the Court will not grant further leave to amend this claim.  Accordingly, the Due Process claim (Second Claim) is DISMISSED with prejudice.

**C.    Inverse Condemnation (Third Claim)**

Plaintiff invokes the Fifth Amendment's Takings Clause, which states, "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V § 4; SAC ¶ 109.  As with a Due Process claim, the Takings Clause requires that "a plaintiff must first establish that he possesses a constitutionally protected property interest."  *See McIntyre v. Bayer*, 339 F.3d 1097, 1099 (9th Cir. 2003) (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000-01 (1984)).

_____

[8] The Court notes, however, that this claim will survive in some form, *see* § II, in that plaintiff also seeks a writ of mandate under California law "directing Defendants to approve the Negotiated Compromise as required under . . . Gov. Code section 65589.5 et seq."  SAC ¶ 131.

1
2
3
4
5

The Court previously dismissed this claim with leave to amend in light of the Court's ruling that plaintiff does not have a vested right in the 2014 Permit. Dkt. No. 48 at 11. Now, having found that the SAC still fails to allege a constitutionally protected property interest, for the same reasons discussed in § I.B above, the Inverse Condemnation/Takings Clause claim (Third Claim) is DISMISSED with prejudice.

6
7

### D.    Equal Protection (Fourth Claim)

8
9
10
11
12
13
14
15
16
17
18

Plaintiff's "equal protection claims do not require a constitutionally protected property interest." *See Hermosa on Metropole, LLC v. City of Avalon*, 659 F. App'x 409, 411 (9th Cir. 2016) (citing *Outdoor Media Grp. v. City of Beaumont*, 506 F.3d 895, 903 (9th Cir. 2007)). The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). The parties agree that because plaintiff asserts an Equal Protection claim as a "class of one" rather than based on membership in a protected class, rational basis review applies; that is, the action being challenged must bear "a rational relation to some legitimate end." *See Romer v. Evans*, 517 U.S. 620, 631 (1996); *see also Engquist v. Oregon Dept. of Agriculture*, 478 F.3d 985, 993 (9th Cir. 2007) ("we have applied the class-of-one theory in the regulatory land-use context to forbid government actions that are arbitrary, irrational, or malicious") (citations omitted).

19
20
21
22
23
24
25
26

The Court previously deferred ruling on this claim until after the filing of the second amended complaint. Dkt. No. 48 at 10. The Court now finds that the SAC pleads sufficient facts for the Equal Protection claim to survive a motion to dismiss. In the SAC, plaintiff contends that defendants "singled out and targeted Plaintiff" in multiple ways: (1) by cancelling the 2014 Permit, instead of revoking or suspending it, as it did with other properties; (2) by citing plaintiff for a violation of "work beyond permit scope" violation under San Francisco Building Code (SFBC) section 106A.4.7 but then requiring plaintiff to submit to the Conditional Use Authorization requirements of Planning Code section 317 (for a "tantamount to demolition" violation);[9] (3) by

27
28

---

[9] Plaintiff further alleges that the CUA process under Planning Code section 317 required plaintiff to go to a hearing before the Planning Commission, whereas following the "work beyond

United States District Court
Northern District of California

imposing CUA Decision I; and (4) by imposing CUA Decision II.  SAC ¶ 114.  By doing so, plaintiff alleges defendants intentionally treated it "differently than similarly situated properties, including one owned by Planning Commissioner Dennis Richards."  *Id.*  The SAC also alleges that after learning of the demolition at the subject property, Supervisor Aaron Peskin wrote to the head of the Planning Department and others, "This is insane.  We need to figure out how to stop this.  I am going to start holding hearings as this is happening way too often and is entirely unacceptable."  *Id.* ¶ 40.

It may behoove plaintiff to narrow its theories of liability in the future.  For now, the Court finds adequate plaintiff's allegations that it was singled out for unfair treatment with the imposition of CUA Decision I and CUA Decision II.  With CUA Decision I, plaintiff presented a project proposal "for a three-story single-family home substantially similar to the one previously approved by the Planning Department in the 2014 Permit."  *Id.* ¶¶ 46, 62.  Yet despite prior approval of a three-story, 3,675 square foot single-family home, in December 2018 the Planning Commission "approved" a plan in which plaintiff would be required to rebuild a replica of the original, 927 square foot house built in 1935 and to install an "interpretative plaque" stating that the property was a replica of a Neutra design that had been "accidentally demolished" and rebuilt per the decision of the Planning Commission.  *Id.* ¶ 65.  Plaintiff alleges this decision was issued after the close of public comment and without any warning to plaintiff that the Commission was considering approving this "wholly *different* project" from what was previously permitted.[10]  *Id.*  In 2019, plaintiff, the City Attorney's Office, and Planning Department staff engaged in nearly seven months of negotiations, with staff checking in with the Planning Commission on what it would be inclined to approve, to negotiate a compromise on a two-unit building totaling 4,180 square feet.  *Id.* ¶ 71.  Yet at the Planning Commission hearing on this project, the Commission rejected the negotiated

---

permit scope" process would have allowed plaintiff to proceed without a Planning Commission hearing.  SAC ¶¶ 48, 101-102.

[10] The SAC alleges that between March 2018 and October 2018, Planning Department staff "began demanding Plaintiff modify its plan for the Property" by removing the third floor of the project but does not allege that staff indicated plaintiff may only receive approval for rebuilding the original one-story 927 square foot home.  *See* SAC ¶ 52.

proposal and approved a two-unit project comprised of 3,280 square feet and without the roof deck that would have made the project comply with "open space" regulations under the Planning Code. *Id.* ¶¶ 77-79.

In their motion to dismiss, defendants do not provide a rational basis for the Planning Commission's actions. Defendants state that "the City's Planning Code provides broad discretion to the Planning Commission to shape projects in the Conditional Use process[,]" Mot. at 23, but that argument does not address whether the Planning Commission exercised its discretion in an arbitrary, irrational, or malicious manner. *See Engquist*, 478 F.3d at 993.

Defendants also argue that they "required other similarly situated property owners who demolished residences without appropriate permits to obtain and comply with a conditional use authorization requirement of Section 317 of the Planning Code." Reply at 12 (citing Defs' RJN, Ex. H). Meanwhile, the SAC describes two properties that plaintiff alleges were similarly situated, in that they were also cited for exceeding the scope of their permits, but that those properties did not have their permits cancelled and/or were not forced to submit to the CUA process that required a Planning Commission hearing. *See* SAC ¶¶ 55, 82-84. These sorts of factual disputes are best reserved for summary judgment and the Court will not at this stage engage in analysis of the similarities and differences of various real property and the types of building permit violations that occurred at each.

Rather, taking plaintiff's allegations as true, the Court DENIES defendants' motion to dismiss the Equal Protection claim (Fourth Claim) of the SAC.

### E.     Excessive Fines (Fifth Claim)

The Excessive Fines Clause of the Eighth Amendment prohibits the government from imposing "excessive fines" as punishment. *See* U.S. Const. amend. VIII. The Excessive Fines Clause is an incorporated protection applicable to the States under the Fourteenth Amendment's Due Process Clause. *Timbs v. Indiana*, 139 S. Ct. 682, 691 (2019). "The Excessive Fines Clause . . . limits the government's power to extract payments, whether in cash or in kind, as punishment

United States District Court
Northern District of California

1  for some offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (internal quotation marks

2  and citation omitted).

3          The Court previously deferred ruling on Plaintiff's Excessive Fines claim until after the

4  filing of the SAC.  Dkt. No. 48 at 10.  Plaintiff now asserts defendants violated the Excessive Fines

5  Clause when, "as punishment for Plaintiff exceeding the scope of the 2014 Permit, they invalidated

6  Plaintiff's vested rights and/or property interests by unlawfully cancelling the 2014 Permit."  SAC

7  ¶ 118.  Plaintiff also alleges that "CUA Decision I and CUA Decision II deprived Plaintiff of any

8  viable economically productive use of the Property.  Defendants imposed this arbitrary, unlawful

9  and excessive fine on Plaintiff all without notice, opportunity to object or appeal, and without due

10  process of law."  *Id.*

11          For several reasons, the Court finds the Excessive Fines Clause inapplicable to the facts at

12  hand.  First, in *Browning-Ferris Industries of Vermont, Inc., v. Kelco Disposal, Inc.*, 492 U.S. 257

13  (1989), the Supreme Court explained that the Eighth Amendment was addressed to "bail, fines, and

14  punishment," and that those matters "traditionally have been associated with the criminal process,

15  and by subjecting the three to parallel limitations the text of the Amendment suggests an intention

16  to limit the power of those entrusted with the criminal-law function of government."  *Browning-*

17  *Ferris Indus.*, 492 U.S. at 262-63.  Although the *Browning-Ferris* Court refrained from "go[ing] so

18  far as to hold that the Excessive Fines Clause applies just to criminal cases," this Court is doubtful

19  that "the outer confines of the Clause's reach" encompass the conduct plaintiff alleges here.  *See id.*

20  at 263-64; *see also Kortlander v. Cornell*, 816 F. Supp. 2d 982, 994-95 (D. Mont. 2011) (granting

21  judgment on the pleadings in favor of federal agents who seized property during investigation,

22  explaining, "Since Kortlander was never even charged with an offense, let alone required to pay a

23  fine as punishment for being convicted of an offense, the [Excessive Fines Clause claim] must be

24  dismissed as implausible") (citing *Bajakajian,* 524 U.S. at 327-28).  Plaintiff cites no cases applying

25  the Excessive Fines Clause to a local agency's review of a conditional use or permit application or

26  to any other like land-use context, and the Court finds the Clause a poor fit to the facts alleged here.

27          In support of its claim, plaintiff cites only to *Bajakajian*, 524 U.S. at 334.  *See* Opp'n at 31-

28  32.  In that case, the Supreme Court concluded that the forfeiture of foreign currency during a

criminal proceeding was punitive, and was "thus a 'fine' within the meaning of the Excessive Fines Clause[.]"  *See Bajakajian*, 524 U.S. at 334; *see also Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 770 (7th Cir. 2019), *cert. granted sub nom. FTC v. Credit Bureau Ctr.*, No. 19-825, 2020 WL 3865251 (U.S. July 9, 2020) (explaining that the first step in an Excessive Fines analysis is whether there is a "fine" and holding that an injunction does not implicate the Excessive Fines Clause because it is not a fine).  Here, plaintiff has failed to allege that it was subject to a fine. Plaintiff points to the allegedly "unlawful" enforcement of Planning Code section 317 as well as the imposition of CUA Decision I and CUA Decision II.  *See* Opp'n at 32.  These do not constitute a fine, either in cash or in-kind, as encompassed by the Excessive Fines Clause.  *See Bajakajian*, 524 U.S. at 328; *see also Fed. Trade Comm'n*, 937 F.3d at 770 ("The Supreme Court has limited 'fines' to 'cash [or] in-kind payment[s] imposed by and payable to the government.'") (quoting *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 136 n.6 (2002) (quotation marks omitted)).

Finally, even if the actions plaintiff complains of were "fines" within the meaning of the Eighth Amendment, the Court also finds implausible plaintiff's allegation that the imposition of CUA Decision I and CUA Decision II "was plainly excessive in that it deprived Plaintiff of any viable economically productive use of the Property."  *See* Opp'n at 32.  For the reasons stated in § I.B, above, the allegation that plaintiff has been deprived of any economically productive use of the property is not plausible in light of the fact that plaintiff received approval to proceed with a two-unit project totaling 3,280 square feet.  *See* SAC ¶¶ 77-79.

Because this claim cannot be saved by the allegation of additional facts, the Court DISMISSES the Fifth Claim with prejudice.

## II.     State Law Claims

Plaintiff brings two state law claims in the SAC: writ of mandate per California Code of Civil Procedure § 1094.5 or 1085 (Sixth Claim); and writ of mandate per California Code of Civil Procedure § 1094.5 or 1085, under California Government Code § 65589.5 (Seventh Claim).

In the motion to dismiss, defendants state that plaintiff's state law claims must be dismissed as barred by the statute of limitations.  Defendants argue that plaintiff should have brought a

mandamus action "within 90 days of the cancellation of the 2014 Permit[.]" Mot. at 26-27 (citing Cal. Code Civ. Proc. § 1094.6). Yet the crux of plaintiff's complaint is that defendants "unlawfully cancelled" its 2014 Permit, rather than revoking or suspending the permit, and that this "unlawful cancellation" left plaintiff in a proverbial no-man's land, where it was deprived of the right to an automatic appeal to the Board of Appeals that would have attached if DBI had revoked the permit. SAC ¶¶ 90, 100. Where the misconduct alleged in the SAC was the very deprivation of plaintiff's appellate rights, the Court will not at this stage dismiss the complaint on statute of limitations grounds for failure to appeal the 2014 Permit cancellation. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) ("[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.") (citation omitted).

Defendants also argue the amended complaint fails to state a claim for writ relief under California Code of Civil Procedure § 1094.5 or § 1085. They argue that the Planning Commission acted within its authority in issuing CUA Decision II, that plaintiff's allegation that it did not have notice or meaningful opportunity to be heard before CUA Decision II is "disingenuous," and that California Government Code section 65589.5 "provides no guarantees that a project will be approved as proposed." Mot. at 28-29. Defendants focus on factual disputes better reserved for summary judgment. Their arguments rest on (1) whether plaintiff received an opportunity to be heard before the Planning Commission issued CUA Decision II, and (2) whether CUA Decision II is properly categorized as a "disapproval" of plaintiff's project. *See id.* at 29. But plaintiff's SAC alleges that, after plaintiff had an opportunity to present its project and after the close of public comment, with no warning to plaintiff that the Planning Commission was considering approving a project that was 900 square feet less than the "Negotiated Compromise," the Planning Commission issued CUA Decision II. SAC ¶¶ 76-79. Plaintiff also alleges that CUA Decision II was issued "under the guise of an 'approval,'" rather than as a disapproval, which would have triggered certain required findings under Government Code section 65589.5. *See id.* ¶ 76; Opp'n at 31.

Treating plaintiff's allegations as true, the Court finds dismissal of the state law claims at this stage is not warranted and accordingly DENIES the motion to dismiss the state law claims from

the SAC.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court orders as follows:

Defendants' motion to dismiss is GRANTED in part, and plaintiff's First Claim for violation of the First Amendment is DISMISSED with leave to amend.  Plaintiff's Second Claim for violation of Due Process, Third Claim for Inverse Condemnation/Takings, and Fifth Claim for Excessive Fines are DISMISSED with prejudice.

Defendants' motion to dismiss is DENIED in part as to plaintiff's Fourth Claim for violation of Equal Protection and Sixth and Seventh Claims for writs of mandate under California state law.

Plaintiff is granted leave to amend only insofar as needed to amend its First Claim.  Any Third Amended Complaint is due no later than **September 16, 2020.**

The Court CONTINUES the further case management conference set for September 4, 2020, to **October 16, 2020, at 3:00 p.m.**  The parties' joint case management statement shall be due **October 9, 2020.**


**IT IS SO ORDERED**.

Dated: September 2, 2020

_____
SUSAN ILLSTON
United States District Judge